Filed 11/30/15  Q.L. v. Superior Court CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| Q.L.,<br><br>        Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>        Respondent;<br><br>SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Real Party in Interest. | D068601<br><br><br>(San Diego County<br>Super. Ct. No. J518948A-C) |

PROCEEDINGS in mandate after referral to a Welfare and Institutions Code section 366.26[1] hearing.  Sharon L. Kalemkiarian, Judge.  Petition denied; request for stay denied.

Dependency Legal Group of San Diego and Amanda J. Gonzales for Petitioner.

---

1      All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

No appearance by Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Dependency Legal Group of San Diego and Beth Ploesch for Real Parties In Interest, Kenneth S., D.T., and K.T., Minors.

Q.L. seeks review of juvenile court orders setting hearings under section 366.26. She asserts that she was not provided with reasonable services. We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Q.L. is the mother of five children. This proceeding concerns her three oldest children, Kenneth S., D.T., and K.T. (collectively, the minors), who are now ages 16, 14, and 13 years old, respectively.[3] Q.L.'s husband, Sean L., is the father of her two youngest children (siblings). Q.L. suffers from serious health problems, including a significant seizure disorder, lupus, impaired mobility, blood clots, and colitis.

Q.L. was hospitalized in November 2011 and the children were sent to stay with a maternal aunt in Los Angeles County. Another relative contacted the Los Angeles County Department of Children and Family Services (DCFS) alleging that Q.L. had neglected the children and that Sean had physically abused the children and had hit Q.L.

---

[2]    Because the issue on review is narrow in scope, we have abbreviated our statement of the facts of this lengthy dependency proceeding. (See *In re Holly B*. (2009) 172 Cal.App.4th 1261, 1263.) Additional relevant facts are included in the discussion section of this opinion.

[3]    Kenneth's father is deceased. D.T. and K.T.'s father is not a party to this proceeding.

Fourteen-year-old Kenneth S. told a DCFS social worker that Sean regularly hit him in the chest with his fist as punishment. Kenneth described an incident in which Sean punched him in the face, smashed him into a light fixture, struck him with a piece of plastic, and stomped on him while he was on the ground. Because of his mother's poor health and frequent hospitalizations, Kenneth often was responsible for caring for his younger siblings.

D.T., then 12 years old, reported that his mother had been very ill during the past few months, and that he and his siblings were often left home alone. D.T. said that approximately four to six months earlier, Sean had punched him in the face for drinking juice. Sean had hit D.T. with a belt or switch on multiple occasions, and once had kicked both him and Kenneth in their private parts, hurting them "real bad."

Eleven-year-old K.T. told the social worker that conditions in the family home were stressful because of his mother's illness. K.T. had a history of running away from home. K.T. said that the first time he tried to run away, Sean slammed his face into a wall. K.T. said that approximately six months earlier, Sean had used an electrical cord to whip K.T. on his legs, resulting in bleeding, bruising and scarring.

Eight-year-old P.L. and seven-year-old S.L. confirmed that Sean hit their older brothers. S.L. said that his father had punched him in the stomach on one occasion, knocking him into a dresser. S.L. told the social worker that he was afraid of his father. P.L. said, "We would do better not going back home because [my father] is always hitting on my brothers and it's real scary."

The children reported that Q.L. was sometimes present when Sean disciplined them, but said that she was not aware of the extent of Sean's physical abuse.

3

Both Q.L. and Sean denied that Sean had physically abused the children. Sean explained the difficulties that the family experienced as a result of Q.L.'s health issues. Q.L. told the social worker that she had a significant seizure disorder and had suffered a stroke, and that she was experiencing some memory loss.

DCFS filed a multi-count petition under various subdivisions of section 300, which was later amended to a single count under section 300, subdivision (a), alleging that Sean physically abused the children and that Q.L. was unable to prevent the abuse. The Los Angeles County juvenile court sustained the petition, removed the children from parental custody, and ordered DCFS to provide family reunification services. Q.L. was offered individual counseling and conjoint counseling with the children, "when appropriate."[4] Sean was prohibited from visiting D.T. and K.T. The court ordered DCFS to provide the family's therapists with copies of the sustained petitions, case plans, and DCFS court reports.

Because the family lived in San Diego, the Los Angeles County juvenile court transferred the case to the San Diego County juvenile court (juvenile court). Los Angeles County case records were electronically transferred to the juvenile court in April 2014. In May 2014, the juvenile court ordered the Agency to comply with the DCFS case plan or to file a modification petition to change the plan's requirements. The Agency provided the parents with referrals for domestic violence treatment counseling, child abuse group therapy, parenting classes, substance abuse treatment services, and housing.

---

4       Sean's case plan was similar to Q.L.'s case plan but involved only P.L. and S.L.

The maternal aunt was not able to maintain the minors in her care. In June 2014, the Agency placed the minors in foster care in San Diego County.[5] The minors began therapy in San Diego County in July. The social worker asked the minors' therapists to advise the Agency when they were ready for conjoint therapy with Q.L. In October, Kenneth's therapist said that Kenneth was not ready to begin conjoint therapy. D.T.'s therapist advised that D.T. was not ready to begin conjoint therapy. K.T.'s therapist did not respond to the inquiry. Q.L.'s therapist said that she was ready to participate in conjoint therapy with her children.

The minors continued to have serious behavioral problems. In November, over Q.L.'s objection, Kenneth was placed with a paternal aunt in northern Los Angeles County. The paternal aunt agreed to drive Kenneth to San Diego once a month to visit his siblings. The Agency offered to provide public transportation services to Q.L. to visit Kenneth once a week. Q.L. explained that she could not travel alone or sit for long periods of time because of her health problems, and asked the Agency to either provide a plane ticket or reimburse the costs for Sean to drive her to visit Kenneth.[6] The social worker explained that the minors did not want to see Sean, and that it was not a good idea for him to drive Q.L. to visits.

Q.L. participated in therapy. She filed an atonement letter and a safety plan with the court. The social worker asked Q.L. to write a more sincere atonement letter and to develop a more specific safety plan that would address how Q.L. would protect the children if Sean were

---

[5] At the parents' request, the siblings had been placed in foster care in San Diego to facilitate reunification.

[6] DCFS had reimbursed Q.L. for her driving expenses from San Diego to northern Los Angeles County to visit the minors.

to become angry. The Agency asked Q.L. to provide a letter from her doctor describing her medical conditions and any limitations on her ability to travel.

At the six-month review hearing in November 2014, the juvenile court ordered the Agency to provide therapy to Kenneth in Los Angeles County and to reimburse Q.L. for her travel expenses to visit Kenneth the following week, pending review of her medical information. The juvenile court found that Q.L. and Sean had made progress with their case plans and that reasonable services had been offered or provided to the family. The court ordered Q.L. to continue working on her atonement letter, and stated that when the letter was complete, conjoint therapy would begin with D.T. and K.T., and the Agency would have discretion to permit her to have unsupervised visits with the minors.

In December 2014, the social worker arranged for Kenneth to be referred to a facility in Los Angeles County for therapy. When she learned that there was a four to six month waiting list at that facility, she contacted Kenneth's former therapist, who referred her to another facility. That facility began the process of obtaining Medi-Cal authorization for Kenneth's therapy.

At the 12-month hearing in Kenneth's case,[7] the juvenile court found that Q.L. consistently and regularly visited Kenneth, and that she had made significant progress in resolving the problems that led to his removal from the home. The court found that reasonable services had been provided or offered to Q.L.

In February 2015, the Agency asked the juvenile court to reinstate supervised visitation, citing a number of incidents that had occurred in the past month. Kenneth said that Q.L. had

---

[7]    D.T.'s and K.T.'s father contested the Agency's recommendations to terminate his reunification services, and the juvenile court continued their 12-month review hearings.

telephoned him and yelled at him for not coming to visit her in San Diego. The social worker had approved arrangements to allow Q.L., D.T. and K.T. to have dinner together twice a week. The foster mother had offered to transport D.T. and K.T. to visits if Q.L. would telephone her to confirm the visit. Q.L. said that she would telephone the foster mother, but the foster mother said that she did not hear from Q.L.

In February, at a special hearing, the juvenile court ordered unsupervised visitation between Q.L. and the minors. The juvenile court ordered visits with D.T. and K.T. every Wednesday and Saturday, and directed Q.L. to identify where and when the visit would take place, and who would be transporting the minors, the day before the visit.[8] The minors were not to be transported by any person who had not been approved by the Agency.

In March, the children met in Orange County to celebrate Kenneth's birthday. Kenneth was looking forward to seeing Q.L. She did not attend the visit. Q.L. told Kenneth that she could not come because her driver had not had a background check.

Q.L. was in the hospital on the date of the 12-month review hearing for D.T. and K.T. The juvenile court continued their review hearing to the 18-month review date. The social worker reported that Q.L.'s hospitalizations were becoming more frequent.

In reports prepared for the 18-month review hearing, the Agency recommended that the juvenile court terminate reunification services and set section 366.26 hearings for the children. The social worker reported that Kenneth was doing well in his paternal aunt's home. Kenneth's paternal aunt was willing to become his legal guardian. Kenneth was "very sad" that Q.L. had not visited him during any of her multiple visits to Los Angeles. Q.L. refused the Agency's

---

[8]     The record transcript of this hearing is not included in the appellate record.

offer to pay for a bus ticket to visit Kenneth. K.T. and D.T. wanted to stay with their foster mother, who preferred a permanent plan of long-term foster care in order to be able to obtain more services for them.

At the review hearing, the social worker testified that Q.L. last visited Kenneth in Los Angeles in November 2014. Q.L. was dependent on Sean for transportation. The social worker acknowledged that Q.L. would have to take a train from San Diego to Los Angeles, and a bus from Los Angeles to Lancaster, to visit Kenneth. Q.L. would not acknowledge that all of the children were afraid of Sean. In her atonement letter, Q.L. did not identify Sean as the perpetrator of the abuse and she did not acknowledge the specific harm that he had inflected on the children.

According to the social worker, Q.L.'s visitation with D.T. and K.T. was sporadic. The social worker had contacted a visitation center to set up weekly visits. There was a two-month waiting list for services. Beginning in June, visitation center personnel tried to contact Q.L. every week for three weeks, leaving messages on Q.L.'s telephone. When they did not hear from Q.L., they removed her from the waiting list. The social worker acknowledged that Q.L.'s telephone "has always been unreliable" and said that she did not know whether Q.L.'s telephone was functioning during that time.

The social worker testified that she was assigned to the case in October 2014. She said that she was not aware of the extent of Q.L.'s medical issues. Despite the social worker's request, Q.L. did not provide any medical information to her and did not sign a medical release. The social worker was aware that Q.L.'s health problems had impeded visitation on several occasions. The social worker did not review the DCFS file when she received the case

8

because the file had been misplaced during an office move. She located the DCFS file in December 2014 and reviewed it in January 2015.

The social worker reported that Kenneth and Q.L. did not have conjoint therapy because there were problems transferring Kenneth's medical coverage to Los Angeles County. The social worker acknowledged that the Agency had not provided transportation services for Kenneth to visit Q.L. in San Diego. The Agency's plan was to provide transportation services to Q.L. to visit Kenneth in Los Angeles. The social worker said that she informed Sean that if Q.L. "did have some sort of debilitating medical condition, it would only help her child welfare case as to us being able to help her with visitation, showing the court why she's missed so many visitations." Sean said that he would bring the documents regarding Q.L.'s medical condition to the Agency's office. He telephoned the social worker to tell her that he had left the documents in the reception area. The social worker checked for the documents, but they were not in her bin.

Q.L.'s therapist testified that he understood that the protective issue was the physical and emotional abuse of Q.L.'s children by her husband. According to the therapist, Q.L. always cooperated with the therapy process and had an above average understanding of the protective issues. Q.L.'s presentation was fairly normal. The therapist said that Q.L. was always calm and her thinking patterns were cohesive. Q.L. believed that Sean corporally disciplined the children by spanking them with his hand and a belt.

Q.L. testified that as her stress levels increased, she experienced more seizures. She used to have approximately three seizures a year but she had had eight seizures in the past three months. Q.L. was taking four different anti-seizure medications and two blood thinners.

9

She required regular, twice daily injections of one of the blood thinners. According to Q.L., the social worker was aware of her condition. A social worker had brought the children to visit her when she was in the hospital with blood clots in her lungs. Her doctor tried to telephone the social worker. When Q.L. told the social worker that the doctor was trying to contact her, the social worker told her that the social workers' telephone lines had been switched during a move. Q.L. stated that she had left paperwork about her medical condition at the Agency's office and said that later, Sean also left paperwork for the social worker at the Agency's office.

Q.L. said that she maintained contact with Kenneth by telephone, texting, and chat video and that they used to talk almost every day. Last month they spoke approximately once a week. Q.L. testified that she repeatedly asked the social worker to transport Kenneth to San Diego for visits and to allow Kenneth to take Metrolink to visit her when she and Sean were in Los Angeles. Q.L, testified that the social worker denied her requests and instead offered to pay for Q.L.'s train and/or bus tickets to visit Kenneth.

Q.L. said that it was difficult to arrange visits with K.T. and D.T. The social worker told her to telephone the foster parent, and the foster parent told her to telephone the social worker. Q.L. asked for a set visitation schedule, but there was never any schedule. Q.L. was on a waiting list for transportation. She was told that she did not have priority because her visits with the minors were unsupervised.

Q.L. said that she had attended an intake with K.T.'s therapist approximately a week before she was hospitalized in April. Q.L. claimed that the therapist had contacted her directly, saying that the social worker was not returning the therapist's telephone calls. Another session

10

was scheduled for the following week but Q.L. was hospitalized that day. Q.L. did not meet with D.T.'s therapist because she was told that D.T. was not ready for conjoint therapy.

K.T.'s and D.T.'s foster mother said that her interactions with Q.L. were always pleasant. When the social worker was involved, interactions became overwhelming and chaotic. The foster mother was required to telephone the social worker and ask permission to schedule visits. Q.L. attended a school meeting for D.T., and came to the hospital when D.T. broke his arm. The foster mother took K.T. and D.T. to visit Q.L. in the hospital.

Sean testified that the social worker never asked about Q.L.'s health. He said that he had left paperwork documenting her condition at the Agency.

The juvenile court determined that reasonable reunification services were offered or provided to the family. While the parents had made more progress in services prior to an inexperienced social worker being assigned to the complicated case, there was a preponderance of evidence to show that the Agency had offered or provided reasonable services to the parents. The juvenile court found that there was not a substantial probability that the minors could be returned to Q.L.'s care, terminated reunification services and set section 366.26 hearings for the minors.[9]

Q.L. petitioned for review of the juvenile court's orders under California Rules of Court, rule 8.452. Q.L. requests that this court reverse the orders setting the section 366.26 hearings. This court issued an order to show cause, the Agency responded and the parties waived oral argument.

---

[9]    The juvenile court returned the siblings to the parents' care.

# DISCUSSION

## A

### *ISSUES ON APPEAL*

Q.L. argues that reasonable services were not provided to reunify the family. She contends that the Agency did not make a good faith effort to implement therapy for Kenneth, and conjoint therapy between herself and each of the minors, as required by their court-ordered case plans. Q.L. contends that the Agency did not make reasonable efforts to arrange visitation with D.T. and K.T. She also asserts that the social worker's inexperience caused the reunification plan to collapse and that the social worker did not meet her obligation to assist Q.L. in the areas in which compliance proved difficult. She faults the social worker for not reading the DCFS reports until January 2015, and not providing the parents' therapists with copies of the petitions and reports, as ordered by the Los Angeles County juvenile court.

## B

### *STATEMENT OF LAW AND STANDARD OF REVIEW*

Family reunification services play a critical role in dependency proceedings. (§ 361.5; *In re Alanna A*. (2005) 135 Cal.App.4th 555, 563; *In re Joshua M*. (1998) 66 Cal.App.4th 458, 467; see 42 U.S.C. § 629a(a)(7).) Services "may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children." (§ 300.2.) Reunification services should be tailored to the particular needs of the family. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793-794, citing *In re Alvin R*. (2003) 108 Cal.App.4th 962, 972 (*Alvin R.*).) At each review hearing, if the child is not returned to his or her parent, the juvenile court is required to determine whether "reasonable services that were

12

designed to aid the parent . . . in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent . . . ." (reasonable services finding).  (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).)

The "adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case."  (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164 (*Robin V.*).)  To support a finding that reasonable services were offered or provided to the parent, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414 (*Riva M.*).)

In addition, to promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child.  (§ 362.1, subd. (a)(1)(A); *Alvin R.*, *supra*, 108 Cal.App.4th at p. 972.)  "Visitation between a dependent child and his or her parents is an essential component of a reunification plan, even if actual physical custody is not the outcome of the proceedings."  (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580; *In re J.N.* (2006) 138 Cal.App.4th 450, 458.)  The Agency is required to make reasonable efforts to assist the parents in areas where compliance proves difficult, including providing transportation services or modifying the location of the visits.  (*Riva M.*, *supra*, 235 Cal.App.3d at p. 414; *Robin V.*, *supra*, 33 Cal.App.4th at p. 1165; *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.)

13

We review a reasonable services finding to determine if it is supported by substantial evidence. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 413-414.) The burden is on the petitioner to show that the evidence is insufficient to support the juvenile court's findings. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

C

*REASONABLE VISITATION SERVICES WERE OFFERED TO Q.L.*
*IN K.T.'s AND D.T.'s CASES*

The record shows that Q.L. was offered unsupervised visitation with all of her children during the review period. In November 2014, Q.L. and Sean met with the social worker, who approved a plan to allow Q.L. to have dinner with D.T. and K.T. twice a week. In January 2015, the foster mother offered to transport D.T. and K.T. to visits if Q.L. would telephone her to confirm. In view of Q.L.'s health problems and frequent hospitalizations, it was not unreasonable to ask her to confirm the visit the day before it was scheduled.

At a special hearing on February 4, 2015, the juvenile court set a schedule for unsupervised visitation between Q.L., K.T. and D.T. Q.L. was responsible for identifying the location and time of the visits, and who would be transporting the minors, the day before the visit. Visits were to occur each week on Wednesday and Saturday. At the 18-month review hearing, Q.L. said that when she telephoned the foster mother, the foster mother told her to telephone the social worker. K.T. and D.T.'s foster mother said that the social worker had to approve each visit.

The plain wording of the juvenile court's February 4 order scheduling visits every Wednesday and Saturday indicates that the foster mother misunderstood, or was not aware of, the court's visitation order. There is no indication in the record that Q.L. brought this issue to

14

the attention of her attorney or the court, or tried to resolve the issue in order to effect the court's order. If she had done so, the issue could have been resolved. Although the juvenile court found that there was miscommunication and misunderstanding between the social worker and Q.L., and between the social worker and Sean, the record does not support Q.L.'s claim that the social worker was solely responsible for the communication problems concerning visitation with K.T. and D.T., and that as a result, Q.L. did not receive reasonable visitation services.

The record shows that the social worker approved a plan for Q.L. to visit with K.T. and D.T. twice a week, on the condition that Q.L. telephone the foster mother to confirm the visit. When Q.L. failed to contact either the foster mother or her sons, the social worker brought the visitation problems to the attention of the juvenile court. The juvenile court authorized unsupervised visitation and set a regular visitation schedule, but there is no indication in the record that Q.L. had weekly visits with K.T. and D.T. The social worker then tried to set up regular visitation, with transportation services, at a visitation center. The visitation center telephoned Q.L. at least three times and left messages, but did not hear from her. Q.L.'s telephone may or may not have been working at that time. However, if her telephone was not working, it was her responsibility to identify another means for the social worker and service providers to contact her. If Q.L. was concerned about her visitation services, she could have contacted the visitation center to check on the status of her application. The record contains substantial evidence to support the juvenile court's finding that reasonable visitation services were offered to Q.L. in D.T.'s and K.T.'s cases.

*THERE IS SUBSTANTIAL EVIDENCE TO SUPPORT FINDINGS THAT KENNETH RECEIVED REASONABLE THERAPEUTIC SERVICES AND THAT THE AGENCY MADE REASONABLE EFFORTS TO IMPLEMENT CONJOINT THERAPY*

On November 25, 2014, when Kenneth was placed in the home of his paternal aunt, the juvenile court ordered the Agency to provide therapy to Kenneth in Los Angeles County. The record shows that on December 1, the social worker asked an aide at Casey Family Programs to contact a specific facility in Los Angeles County to set up services for Kenneth. On December 26, the social worker learned that the facility had a four to six month waiting list. On December 31, the social worker spoke with Kenneth's former therapist in Los Angeles County, who referred the social worker to Lancaster Children's Bureau (LCB). The intake coordinator at LCB initiated the process to obtain Medi-Cal approval for Kenneth's therapy. In January 2015, at the 12-month review hearing, the juvenile court made an uncontested finding that reasonable services had been offered or provided in Kenneth's case.

In May, the social worker reported that she was actively working with Los Angeles Children's Bureau (LACB) to enroll Kenneth in individual therapy. LACB reported that as of May 11, Kenneth's Medi-Cal had not been transferred to Los Angeles County and they therefore could not provide services to him. The social worker contacted a DCFS specialist, who reported that Kenneth's Medi-Cal was listed as having been transferred to Los Angeles County. A staff psychologist at the Agency had found an appropriate therapist for Kenneth in northern Los Angeles County and had approved county payment. The social worker sent Kenneth's record to the therapist, and Kenneth's first appointment was scheduled for May 18.

The social worker asked Kenneth's therapist for updates on June 11 and June 25, but the therapist did not respond.

The record permits the reasonable inference that Kenneth began therapy on May 18 and continued to participate in therapy to the date of the court's findings, a period of approximately three and a half months. The issue of whether Kenneth was receiving therapy was not raised at the 18-month review hearing. Because Kenneth received individual therapy for more than half of the review period at issue, we conclude that there is substantial evidence to support the reasonable services finding.

Q.L. contends that conjoint therapy between Kenneth and her was necessary to support meaningful visitation. She argues that the failure to provide therapy to Kenneth from November 2014 to May 2015 resulted in the erosion of their relationship. We are not persuaded by this argument. If there was any erosion in the parent/child relationship, the record supports the reasonable inference that it was due in large part to Q.L's failure to make more of an effort to visit Kenneth. Q.L. does not claim that her visitation with Kenneth was inadequate. Q.L. did not visit Kenneth during any of her trips to Los Angeles, and she did not attend his birthday party in Orange County in March 2015. Kenneth was disappointed and sad that Q.L. did not visit him. There is nothing in the record to indicate that he was ready to participate in conjoint therapy with Q.L.

Similarly, D.T. was not ready for conjoint therapy with Q.L. At the 18-month review hearing, Q.L. testified that D.T.'s therapist did not believe that conjoint therapy was appropriate at that time. The Agency provided therapy to D.T. during the dependency proceedings, including the review period at issue here, with the objective of providing conjoint

17

therapy, when appropriate. The record shows that D.T.'s therapist did not recommend conjoint therapy. We conclude that there is substantial evidence to show that reasonable therapeutic services were provided in D.T.'s case in accordance with his court-ordered services plan.

The record shows that when K.T. was ready for conjoint therapy, his therapist contacted Q.L. and arranged to meet with her before scheduling conjoint therapy sessions between Q.L. and K.T. Q.L. participated in the intake session. Q.L. was not able to attend the scheduled conjoint therapy session the following week because she was hospitalized. There is nothing in the record to indicate that Q.L. telephoned K.T.'s therapist to reschedule the session, or that she asked the social worker for assistance in rescheduling the session. The record permits the reasonable inference that Q.L. could have participated in conjoint therapy with K.T. if she had chosen to take advantage of that service. "[T]here is no 'requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions.' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233, quoting *In re Michael S.* (1987) 188 Cal.App.3d 1148, 1463, fn. 5.) We conclude that there is substantial evidence in the record to show that Q.L. was offered conjoint therapy services with K.T.

E

*ALTHOUGH THE JUVENILE COURT FOUND THAT THE SOCIAL WORKER WAS INEXPERIENCED, THE RECORD SUPPORTS THE FINDING THAT THE AGENCY OFFERED OR PROVIDED REASONABLE REUNIFICATION SERVICES TO Q.L.*

Q.L. contends that the social worker's inexperience and lack of communication skills resulted in the collapse of the reunification plan. Citing the juvenile court's observation that it "came very close" to finding that reasonable services were not provided, Q.L. argues that she participated in services and made substantial progress with her case plan, but that the social

18

worker did not do all that she was required to do under the circumstances. (*In re T.G.* (2010) 188 Cal.App.4th 687, 698.) Q.L. faults the social worker for not reviewing the DCFS file until January 2015, and not providing the therapists with copies of the reports, contrary to court orders.

We are not persuaded by Q.L.'s argument. In April 2014, the Los Angeles County juvenile court ordered DCFS to provide copies of the petition and the court reports to providers. At the 18-month review hearing, Q.L.'s therapist said that he was aware of allegations of domestic violence between Q.L. and Sean because he had read the court reports from the Los Angeles County Superior Court. The therapist was also aware that Q.L.'s daughter, P.L., had disclosed being physically abused because that information was included in the reports from the Los Angeles County Superior Court. The record indicates that Q.L.'s therapist received the court-ordered materials and permits the reasonable inference that a social worker provided the court-ordered materials to the minors' (and Sean's) therapists as well.

In addition, we reject Q.L.'s claim that the Agency did not make a good faith effort to implement the case plan. The case plan was in effect when the less experienced social worker was assigned to the case, and her delay in reading the DCFS file did not change the provision of services to the family. During the review period at issue, Q.L. continued to participate in individual therapy. When Q.L. discontinued therapy, the social worker helped her resume therapy. Q.L. achieved her therapeutic goals. K.T., D.T. and Sean continued to participate in individual therapy. The social worker secured therapy for Kenneth in Los Angeles County. Sean and Q.L. completed their court-ordered reunification case plans in the siblings' cases, and the juvenile court returned the siblings to their care. Q.L. had the same case plan for the

19

minors as she did for the siblings. The minors and the siblings had the same social workers throughout the case. There are no findings that the other social workers who were assigned to the case were inexperienced. As the juvenile court noted, the minors were more severely physically abused for a longer period of time than were their siblings, and required more time to heal from Sean's physical abuse. In its response, the Agency acknowledges that the juvenile court can continue to offer child-centered services, including conjoint therapy, to the minors, even after the conclusion of the reunification period. (§ 366.3, subd. (e).)

"The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The Agency offered or provided court-ordered family reunification services to Q.L., her husband and her children for more than 18 months. As a result of these services, Q.L. was able to reunify with two of her children. The record shows that the Agency made a good faith effort to meet the minors' needs to allow them to reunify with Q.L. Throughout the entirety of the dependency proceedings, DCFS and the Agency provided therapeutic and counseling services to both D.T. and K.T. to address their specific behavioral and emotional needs. Q.L. was offered unsupervised visitation with the minors during the review period. Kenneth, too, received appropriate therapeutic services for a significant time during the proceedings, including therapeutic services for approximately half of the review period at issue. We conclude that there is substantial evidence in the record to support the finding that reasonable services were offered or provided to the parent. (§ 366.22, subd. (a).)

DISPOSITION

The petition is denied.  The request for a stay is denied.


AARON, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.